UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ZERO BARNEGAT BAY, LLC, *Plaintiff*, v. LEXINGTON INSURANCE COMPANY, *Defendant*. | Civil Action Nos: 14-cv-1716 (PGS) (DEA) **MEMORANDUM AND ORDER** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on Defendant Lexington Insurance Company's motion for summary judgment, ECF No. 39. This case arises from an insurance coverage dispute over the amount of wind damage and cost of repairs sustained at Plaintiff Zero Barnegat Bay, LLC's property on October 29, 2012, during Superstorm Sandy. For the reasons expressed herein, Defendant's motion is denied in part and granted in part. As part of Defendant's motion, it seeks to excluded the report and testimony of Shannon Cook, as an expert. It is preferable to decide same on an in limine motion, rather than by summary judgment. As such, that part of the motion is denied without prejudice.

I

During the time of Superstorm Sandy, and thereafter, Plaintiff Zero Barnegat Bay, LLC (hereinafter "Zero Barnegat" or Plaintiff) maintained a homeowner's insurance policy for property located at Middle Sedge Island, in Normandy Beach, New Jersey. (Def. Statement of Facts ("SOF") ECF No. 39-2, at ¶¶ 2-3). The policy was underwritten by Defendant Lexington Insurance Company, (hereinafter "Lexington" or Defendant). (Def. SOF at ¶ 3; *see also* Lexington Ins.

1

Policy, ECF No. 39-4). Plaintiff's deductible for claims arising out of wind and hail damage was $21,860.00, or 2% of the total coverage dwellings. (*See* Lexington Ins. Policy, at 1; *see also* Def. SOF at ¶ 4).

After Plaintiff's property sustained damage from Superstorm Sandy, Plaintiff submitted a claim to Lexington. (Def. SOF at ¶ 5). Lexington then had the property inspected by Vertex. (*See* Vertex Report, ECF No. 43-3). Vertex issued a report, concluding that high winds caused and contributed to:

- The damage to the roof shingles along the leave edge on the north-facing side of the uppermost roof of the main house;

- The broken window on the north-facing side of the guesthouse;

- The water intrusion at the south-facing bank of windows in the living room on the first level of the main house, however most of the observed damage to the windows existed prior to Hurricane Sandy; and

- The cracks in the gypsum ceiling and walls of the main house, however most of the observed damage to the ceiling and walls existed prior to Hurricane Sandy.

(*Id.* at 7). In accordance with the report, the claims adjuster from East Coast Claims Services, Inc. ("East Coast") determined the wind damage amounted to $17,344.79. (Lexington Estimate, ECF No. 39-5). Specifically, the damages noted by East Coast included line item costs detailing the damage that Vertex had identified as caused by wind. Based on the Vertex report and the East Coast estimate, Lexington denied Plaintiff's claim, because Plaintiff's the damage cost ($17,344.79) was less than the deductible ($21,860.00). (Denial Letter, ECF No. 39-6, at 2).

Plaintiff then hired its own inspector, Shannon Cook, to assess the damages and prepare an estimate of the cost of repairs. (*See* Cook Report, ECF No. 39-7). Cook noted that the type of loss was "wind damage," and upon inspection of the property, estimated that the total for the wind damage was $466,550.47. (*Id.* at 1, 51). Cook identifies substantially the same items as wind-

damaged that the Lexington report and East Coast estimate had identified; however, the Cook report includes more repairs than the East Coast estimate. (*Id.*)

Plaintiff also hired its own causation expert, Todd Heacock, who submitted a report regarding the "condition and circumstances that may have led to the . . . damage to an in-ground pool, the timber framed promenade adjacent to the marine bulkhead, and the transformer located near the eastern side of the island." (Heacock Report, ECF No. 39-9, at 1). Regarding damage to the boardwalk, Heacock opined that "at many locations along the bulkhead, nails or the remnants of nails were observed to be pried up and, in many cases, bent over. The tides during the storm event did extend above the top of the bulkhead and boardwalk. However, high winds occurred prior to the rise in the water level." (*Id.* at 3). Heacock explained, "[o]nce lifted, direct wind pressure would cause the nails at the bulkhead to bend and fail. Later, when the water levels rose, the tide would have carried the remains of the boardwalk away." (*Id.*).

Regarding the electrical transformer, Heacock opined that the wind "caused the transformer to slide off its base" and that "[t]he connection of the power wires below the transforme[r] prevented the upper section of the transformer from being carried away by the wind, or by the effects of flood that occurred after the high wind." (*Id.*). Finally, regarding the pool, Heacock explained that "due to movement caused by wind and later by flood water the pool is severely damaged . . . ." (*Id.* at 4). Heacock concluded, "[t]he effects of wind and rising water caused significant disturbance at the residential property on Middle Sledge Island . . . [i]t is evident from our analysis that wind likely caused significant damage to these items. Additional damage may have occurred due to flood after the severe wind event." (*Id.*).

In summary, Lexington noted wind damage to the property's roof, an exterior window, siding, and the interior of the property. (*See* ECF No. 39-5). However, because this damage

amounted to $17,344.79, less than the $21,860.00 deductible, Lexington denied coverage for the claims. In contrast, Cook, Plaintiff's damages expert, identified $466,550.57 worth of wind damage to interior and exterior of the property, however, he did not provide estimates for the pool, boardwalk, or electrical transformer. Finally, Plaintiff's causation expert only analyzed the cause of damage to the pool, boardwalk, and electrical transformer, and concluded that first wind, then flooding, caused damage to these items.

On March 18, 2014, Plaintiff filed the present complaint, raising four claims: breach of contract (count I); breach of implied covenant of good faith and fair dealing (count II); bad faith (count III); and a violation of the New Jersey Consumer Fraud Act (count IV). (*See* Compl.). Before this Court is Defendant's motion for summary judgment.

II

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey*

4

*Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to set forth specific facts showing that there is a genuine issue for trial). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of the non-moving party, and making all credibility determinations in his favor that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. App'x. 222, 227 (3d Cir. 2007).

### III

1. Breach of Contract Claim (Count I)

In New Jersey, to establish a breach of contract, plaintiffs must show: (1) a valid contract "containing certain terms"; (2) the plaintiff "did what the contract required" him or her to do; (3) the defendant breached the contract; and (4) damages. *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (2016); *see also Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). Plaintiff frames the issue as a dispute over "the amount of wind damage covered by the policy" and thus, because Lexington has already determined that the exact same property was identified as wind damaged in both Lexington's and Cook's estimate, the damage to the property is covered under the policy. Upon examination of Lexington's estimate and Cook's estimate, both illustrate the repairs needed to the property for the wind damage caused by Superstorm Sandy. In fact, the damage estimate

5

prepared by Cook suggest repairs to exactly the same damage that Lexington's damage report noted as being caused by wind: the roof, a broken window, the water intrusion at the south-facing bank of windows in the living room, and the cracks in the gypsum ceiling and walls of the main house. The only difference between both estimates is that Cook provides detailed repairs and includes additional repairs to the flooring, while Lexington's estimate describes only general repairs, at much lower costs. (Cook Report, ECF No. 39-7, at 9, 18, 22-23, 25, 27, 39, 43-44).

Here, the Cook estimate highlights the same damage that the Lexington estimate and damage report noted as being caused by wind, but instead suggests more extensive and costly repairs. Accordingly, because both estimates deal with primarily the same damage that Lexington has previously determined to have been caused by wind, and there exists a genuine issue of material fact as to the amount and scope of the wind damage, and the cost of repairs.

Plaintiff also submitted the Heacock report as support for its claim that wind caused damage to the property's boardwalk, pool, and electrical transformer, and Defendant is thus liable for those damages. Here, Defendant argues that the anti-concurrent/anti-sequential causation clause in the insurance policy bars any recovery for Plaintiff's damages arising from both wind and flood. The policy contains the following provision:

> **SECTION I – EXCLUSIONS**
> A. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.
>
> 3. **Water Damage**
>    Water Damage means:
>    a. Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

(Policy, ECF No. 39-4, at 11-12). Defendant argues that because Heacock identified that first wind, then rain caused damage to the property's boardwalk, pool, and electrical transformer,

6

Plaintiff is barred from recovery for any damages identified in that report under the above referenced exclusion. *See* Heacock Report, ECF No. 39-9.

Courts in this district and in New Jersey have applied and enforced similar anti-concurrent provisions, "to exclude all coverage for a loss occasioned by a flood, even when a flood acts concurrently or sequentially with a covered peril . . . " *Villamil v. Sentinel Ins. Co.*, No. 17-1566, 2018 U.S. Dist. LEXIS 214901, at *22 (D.N.J. Dec. 21, 2018); *see also Jacobsen v. Hartford Ins. Co. Flood & Home (Sandy)*, No. 14-3094, 2017 U.S. Dist. LEXIS 52591, at *32 n.17 (D.N.J. Mar. 31, 2017). In his report, Heacock found "[t]he effects of wind and rising water caused significant disturbance at the residential property on Middle Sledge Island . . . [i]t is evident from our analysis that wind likely caused significant damage to [the pool, boardwalk and transformer]. Additional damage may have occurred due to flood after the severe wind event." (*Id.*). *See* Heacock Report, ECF No. 39-9. Accordingly, based on Plaintiff's own expert, those damages were caused first by wind, and then by flooding, the damage to the boardwalk and the pool, and the policy does not cover the damage to those items. *See* Heacock Report, ECF No. 39-9. Accordingly, the policy's anti-concurrent clause bars recovery for these damages.

In summary, because there is a genuine issue of a material fact regarding the extent and scope of wind damage, Defendant's motion for summary judgment is denied in part with respect to Plaintiff's breach of contract claims. However, because the anti-concurrent clause bars recovery for damage to the pool, boardwalk and transformer, Defendant's motion for summary judgment is granted with respect to those claims.

2. Breach of Implied Covenant of Good Faith and Fair Dealing and Bad Faith (Counts II and III)

Defendant argues summary judgment is appropriate for Plaintiff's bad faith claim, as a Plaintiff has not shown it is entitled to summary judgment on this claim, and under New Jersey law, a

plaintiff that has not shown it is entitled to summary judgment on a breach of contract claim has no claim for bad faith. Under New Jersey law, there is an implied obligation of good faith and fair dealing in every insurance contract. *Badiali v. N.J. Mfrs. Ins. Grp.*, 107 A.3d 1281, 1287 (2015). If an insurance company denies coverage to an insured in bad faith, the insured may bring a claim of bad faith denial of benefits. *Tarsio v. Provident Ins. Co.*, 108 F. Supp. 2d 397, 400 (D.N.J. 2000). The New Jersey Supreme Court has explained that "finding of bad faith against an insurer in denying an insurance claim cannot be established through simple negligence." *Badiali*, 107 A.3d at 1288. Instead, to establish a bad faith claim, a plaintiff must first show "the absence of a reasonable basis for denying benefits of the policy." *Id.* (quoting *Pickett v. Lloyd's*, 621 A.2d 445, 454 (N.J. 1993). The plaintiff must then show "that the defendant knew or recklessly disregarded the lack of a reasonable basis for denying the claim." *Id.*; *see also Ketzner v. John Hancock Mut. Life Ins. Co.*, 118 F. App'x 594, 599 (3d Cir. 2004). However, "an insurance company does not act in bad faith if the plaintiff's insurance claim was 'fairly debatable.'" *Id.* Under the "fairly debatable" standard, "a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad faith refusal to pay the claim." *Id.*

Since the claims for bad faith and claims for breach of implied covenant of good faith and fair dealing are considered as one claim, and since summary judgment on the breach of contract claim was denied, the motion for summary judgment is granted for Defendant on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing and bad faith, Counts II and III.

3. New Jersey Consumer Fraud Act (Count IV)

Finally, Defendant argues that it is entitled to summary judgment on Plaintiff's New Jersey Consumer Fraud Act (CFA) claims, as the CFA is not applicable to the denial of insurance benefits.

The CFA does not provide a remedy for failure to pay benefits. *Nationwide Mut. Ins. Co. v. Caris*, 170 F. Supp. 3d 740, 746-47 (D.N.J. 2016) (citing *Granelli v. Chicago Title Ins. Co.*, 569 Fed. Appx. 125, 133 (3d Cir. 2014) ("New Jersey courts . . . have consistently held that the payment of insurance benefits is not subject to the Consumer Fraud Act.")). "To prevail on a CFA claim, a plaintiff must establish three elements: '1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss.'" *Id.* (quoting *Zaman v. Felton*, 219 N.J. 199, 98 A.3d 503 (N.J. 2014)). The CFA defines an "unlawful practice" as:

> unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, <u>in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance</u> of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

N.J.S.A. § 56:8-2. (emphasis added).

Here, Plaintiff's CFA claim arises out of Defendant's denial of benefits. Because courts are clear the CFA does not provide a remedy for failure to pay benefits, Plaintiff's CFA claims must fail. Accordingly, summary judgment is granted to Defendant on Plaintiff's CFA claim, Count IV.

# ORDER

This matter having come before the Court on Defendant Lexington Insurance Company's motion for summary judgment, (ECF No. 39), and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented, and for the reasons expressed in this Court's accompanying Memorandum Opinion,

IT IS on this 18th day of March, 2019,

**ORDERED** that Defendant's motion for summary judgment (ECF No. 39) is **GRANTED** in part and **DENIED** in part, as follows:

1. Count I (Breach of Contract) is DENIED regarding the scope of the wind damage, and GRANTED regarding the damage to the boardwalk, pool, and transformer;
2. Count II (Breach of Implied Covenant of Good faith and Fair Dealing) is GRANTED;
3. Count III (Bad Faith) is GRANTED; and
4. Count IV (New Jersey Consumer Fraud Act) is GRANTED.

_____
PETER G. SHERIDAN, U.S.D.J.